**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | |
| : | **Case Number: 20mj139** |
| **ANTHONY GRAY** : | |
| : | **Detention Hearing:** |
| **Defendant.** : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
<u>PRETRIAL DETENTION OF DEFENDANT ANTHONY GRAY</u>**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in support of its request that defendant Anthony Gray be detained pending the trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A). The defendant has been charged by Criminal Complaint in the District of Columbia with Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(2). An analysis of the factors set forth in 18 U.S.C. § 3142(g) below leads to the conclusion that detention is appropriate because there is no condition or combination of conditions that will reasonably assure the safety of any person and the community.

<u>**FACTUAL BACKGROUND**</u>

On May 10, 2018, the MPD/FBI Child Exploitation Task Force ("MPD/FBI CETF") began an investigation into allegations that TERRELL ARMSTEAD, (herein "ARMSTEAD"), had sex trafficked a minor and other young women by force, fraud, or coercion. The minor victim (herein, "MV1") was 16 years old at the time ARMSTEAD began transporting her from Maryland, through the District of Columbia, and into Virginia, knowing that she would be engaging in commercial sex acts. As a result of the investigation, in May of 2019, ARMSTEAD was arrested and charged

1

by criminal complainant with Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a)(1) & (b)(2), Sex Trafficking by Force, Fraud, or Coercion, in violation of 18 U.S.C. § 1591, and Obstruction of Enforcement of the Sex Trafficking Statute, in violation of, 18 U.S.C. § 1591(d). On March 16, 2020, ARMSTEAD was convicted following a jury trial of one count of violating 18 U.S.C. § 1591, Sex Trafficking by Force, Fraud, or Coercion.

During the course of the investigation involving ARMSTEAD, law enforcement learned that MV1 met ARMSTEAD when she was 16 years old, through ADULT WITNESS 1 (herein "AW1"). Beginning in early March 2015, ARMSTEAD drove AW1 to MV1's house in Maryland. ARMSTEAD then drove AW1 and MV1 from Maryland to a hotel.  According to witnesses, the hotel may have been a Motel 6.  When MV1, AW1 and ARMSTEAD arrived at the hotel, ARSMTEAD called ANTHONY GRAY, aka "P" aka "Playboy", with a date of birth of May 9, 1983 (herein "DEFENDANT").  The DEFENDANT is the brother of ARMSTEAD's former girlfriend, and mother of his children, Laura Gray.   Once the DEFENDANT arrived at the hotel, the DEFENDANT informed MV1 and AW1 that they were going to be in engaging in commercial sex acts with strangers. The DEFENDANT had a professional looking camera and took pictures of AW1 in order to post advertisements online, offering AW1 for commercial sex.  The DEFENDANT instructed AW1 how to pose for the advertisements, what to say when potential clients called the telephone number featured in the advertisements, and how much to charge for various sex acts.  While AW1 engaged in commercial sex acts in the hotel room on that first occasion, MV1 did not.  ARMSTEAD drove MV1 and AW1 home from the hotel.

The investigation has revealed that, during the weekend of March 14, 2015, ARMSTEAD drove the DEFENDANT, AW1 and MV1 from Lusby, Maryland to a hotel located in Alexandria, VA for the purpose that AW1 and MV1 engage in prostitution. The investigation subsequently

2

revealed that this hotel is a Red Roof Inn, located in Alexandria, VA. Law enforcement has traced and studied the route between Lusby, Maryland and Alexandria, VA, and there is reason to believe that ARMSTEAD, AW1, the DEFENDANT, and MV1 traveled across the Woodrow Wilson Bridge, a portion of which is in Washington, D.C., in order to arrive at the Red Roof Inn located in Alexandria, VA. Once at the Red Roof Inn, the DEFENDANT took pictures of AW1 and MV1 with his camera for the purpose of using the pictures in online advertisements, offering AW1 and MV1, a 16-year-old girl, to individuals looking for the opportunity to engage in commercial sex. The DEFENDANT directed MV1 and AW1 on how to pose in these pictures. The DEFENDANT took some photographs depicting only AW1, some depicting only MV1, and some featuring both females together. The DEFENDANT then used his cellular telephone to post these pictures and advertisements on a website known as Backpage.com[1]. The advertisements were posted on the Alexandria, VA and Washington, DC Backpage pages.

      The DEFENDANT instructed both AW1 and MV1 on what to ask potential clients when they called the telephone numbers featured in the advertisements posted on Backpage.com. The DEFENDANT determined who the clients could be, and the prices that AW1 and MV1 should charge for various sex acts. MV1's face was not shown in any of the pictures posted on Backpage.com, due to her young age. The DEFENDANT and ARMSTEAD instructed that MV1 not loiter outside the hotel room, because it would draw attention from law enforcement. Through witness interviews, law enforcement learned that the DEFENDANT, while inside the hotel room with ARMSTEAD, MV1, and AW1, when referring to MV1's young appearance, stated, "That's the face that's going to get us all hemmed up."

---

[1] Backpage.com was known to law enforcement as a website used to post online sexual solicitation advertisements. The website was seized in April 2018 by the FBI.

The investigation revealed that while AW1 and MV1 were engaging in commercial sex acts in the hotel room, the DEFENDANT and ARMSTEAD would be providing lookout from the car in the parking lot.  MV1 and AW1 were instructed to text ARMSTEAD to let him know when a date arrived, the amount of money that they would charge, and when the date left.  ARMSTEAD and the DEFENDANT would then come to the hotel room in order to collect the money that AW1 and MV1 earned by engaging in commercial sex acts.  Through interviews with MV1 and AW1, as well as a review of records provided by the Red Roof Inn in Alexandria, VA, it appears that the DEFENDANT and ARMSTEAD brought AW1 and MV1 to the hotel in order to engage in commercial sex dates for their financial benefit at least three or four times in March of 2015.

In terms of who financially benefitted from the commercial sex acts that AW1 and MV1 were engaging in, AW1 stated that at first she was splitting the money 50/50 with ARMSTEAD, but that later she began to give the DEFENDANT 100 percent of the money that she earned.  Over time, MV1 provided 100 percent of the money that she earned by being commercially sexually exploited by the DEFENDANT and ARMSTEAD to ARMSTEAD.

During the course of the investigation, online sexual solicitation advertisements, which featured pictures of AW1, MV1 and other young women who are known to law enforcement, were obtained by law enforcement.   These advertisements, which provided MV1, a 16 year old girl, for commercial sex were posted in the Washington, D.C., Northern Virginia, and Southern Virginia sections of Backpage.com, between March 18, 2015 and April 4, 2015. An example one

of the advertisement reads:

> Gorgeous Mercedes Is Back And For A Limited Time – 23:
> Hey boy's it's Sophia & Mercedes, your number one duo. We
> are back to pick up where we left off. So stop wasting time with
> the one's that don't give you what your looking for and is a big
> wast of time. So pick up the phone and call us now and end your
> constant look for what you need!!! Mercedes (443) 404-6564.

This advertisement was posted on March 22, 2015. (http://washingtondc.backpage.com/FemaleEscorts/gorgeous-mercedes-is-back-and-for-a-limited-time/17416769).

      The online sexual solicitation advertisements posted on "backpage.com" were posted using an account associated with email address lovediamondmonroe@yahoo.com. Law enforcement obtained a search warrant for the email account lovediamondmonroe@yahoo.com. This email account was created on January 7, 2015, with the user name "Diamond Monroe" and phone number (240)899-0373. The email account was active but contained no other data, including any archived emails or emails from "backpage.com." A subpoena was sent to AT&T for subscriber information associated with this telephone number. The returns from AT&T provided that the user of that phone number, and the name of the billing party, was "Anthony Gray," aka the DEFENDANT.

      Adult Witness 2, (herein "AW2") met the DEFENDANT in Illinois when she was approximately 17 years old. Through information gathered during the investigation, including recorded calls placed by the DEFENDANT when he was incarcerated, there is reason to believe that the DEFENDANT would drive AW1 and AW2 from parts of Maryland to an area in

5

Northwest, Washington, D.C., known as the "track" or the "Blade"[2] for the purpose of AW1 and AW2 engaging in prostitution.

On February 21, 2020, the trial for ARMSTEAD began in the United States District Court for the District of Columbia. Through the course of normal proceedings, ARMSTEAD became aware that AW2 would be testifying, and he informed the DEFENDANT's sister. On February 22, 2020, the DEFENDANT sent a message to AW2, via Facebook Messenger, acknowledging that he knew that AW2 was a testifying witness. AW2 stated that she felt the DEFENDANT was attempting to intimidate her, and could be attempting to persuade her not to testify.  Below is a portion of the message sent by the DEFENDANT to AW2:

> "Have Somebody ever treated you so bad that you feel like you need to speak or Wright something that will lay them on a bed?" "Nothing you say is valuable or credible." "I never thought you to be one of those but I see you're no different from the Species that walk close to the earth. God bless you with twins and future." "I hope you didn't lie in the things you said because I will do life to tell the truth about everything that happen, are you willing to do the same."

## APPLICABLE LEGAL STANDARD

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the

---

[2] The "track" is a term used to describe an area for outdoor prostitution. The Washington, D.C. "track" is located in the area of 12th Street and K Street, Northwest, Washington, D.C. The Metropolitan Police Department had several police reports of AW1 (one report with AW2) being observed on the "track" and engaging in commercial sex. The timeframe of these report is consistent with the time AW1 and AW2 were working with the DEFENDANT.

motion of the government in a case that involves a violation of section 1591.  18 U.S.C. § 3142(f)(1)(A).  Furthermore, there is a rebuttable presumption that no condition of combination of conditions that will reasonably assure the appearance of the DEFENDANT as required and the safety of the community because the DEFENDANT committed an offense involving a minor victim under 18 U.S.C. § 1591.  18 U.S.C. § 3142(3)(E).  This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the DEFENDANT has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the DEFENDANT has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the

7

courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

For the reasons that follow, the government submits that that the DEFENDANT cannot rebut the presumption that he shall remain detained, as there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community.

### A.     Nature and Circumstances of the Charged Offense

This factor clearly favors detention, since, as stated above, the offense is a crime of violence involving a minor victim.  This DEFENDANT has engaged in a persistent course of conduct of meeting and recruiting vulnerable girls and young women for the purpose of sexually exploiting them for his own financial gain.  In addition to the information MV1 provided to law enforcement, detailed above, when interviewed by law enforcement, AW2 reported that the DEFENDANT was verbally and physically abusive towards her. AW2 recalled a time when the DEFENDANT pushed her into a hotel room, when she attempted to leave him, and, in the process, the DEFENDANT ripped off two of AW2's fingernails.  Even though this incident occurred inside a hotel in the Washington, DC area, AW2 got on a plane and flew back to Illinois to receive treatment in Rock Island, Illinois. AW2 stated that AW1 was more submissive, so the DEFENDANT was not as physically violent toward AW1.

In addition to physical force, as detailed above, the DEFEDNANT would grab AW2's clothes and prevent her from taking anything with her if she tried to leave.  The DEFENDANT also kept AW2's car keys with him. AW2 said that she was not on good terms with her family

8

and she did not know anybody in the Washington, D.C. area, so the DEFENDANT had her "trapped in a sense". If AW2 was able to leave while the DEFENDANT was incarcerated, he would later find her and convince her to come back and continue to work for him.

AW2 reported that the DEFENDANT never threatened to kill her nor threaten her with a weapon. However, AW2 knew of one occasion, in June of 2015, when the DEFENDANT and ARMSTEAD were sharing a gun and staying at a Motel 6 in Dumfries, Virginia. The police responded to the hotel, and they located the gun in the toilet tank inside the hotel room ARMSTEAD was staying in. As a result of this incident, ARMSTEAD was arrested and subsequently convicted for Possession of a Weapon by a Prohibited Person.

AW2 said she worked in commercial sex for the DEFENDANT in multiple states, including West Virginia and Ohio, in addition to frequently working on the prostitution track in downtown Washington, DC. AW2 stated that she was required to give all the money she made from the commercial sex acts to the DEFENDANT. AW2 said in the beginning, the DEFENDANT gave AW2 the option to split the money 50/50, but that soon "went out the window." AW2 said she frequently had to make a quota of $1500 a day for the DEFENDANT.

AW1 and AW2 worked for THE DEFENDANT on and off for years. AW1 advised that, even when the DEFENDANT was in custody in the DC jail, AW1 and AW2 would communicate with the DEFENDANT through jail calls and the DEFENDANT would continue instruct AW1 and AW2 on when and where to work. For example, between August 13, 2015 and September 30, 2015, the DEFENDANT was incarcerated at D.C. Jail as a result of a Parole Violation stemming from a 2012 Pandering conviction in DC. While in custody, the DEFENDANT made approximately 328 jail phone calls to phone numbers associated with AW2. AW1 can be heard in the background or speaking on the phone in some of those calls. In these calls, the DEFENDANT

is heard referring to AW2 and AW1 as "Diamond" and "Sophia", respectively. The investigation has revealed that AW2 and AW1 used those names in the advertisements the DEFENDANT posted on backpage.com. In these jail calls the DEFENDANT placed to AW2, there are discussions about working in commercial sex, making money, working on the "track," and about which hotels AW2 and AW1 should work in. The DEFENDANT also instructed AW2 about how to put money on his "books," either in person or by sending it via Western Union.

The investigation has revealed that, at various points between April 2015 and March 2017, the DEFENDANT would have as many as 4 to 6 different young women engaged in commercial sex acts for his financial benefit. When interviewed, AW1 stated that the DEFENDANT was not physically violent towards her, but that he was physically abusive to AW2. AW1 recalled an incident where the DEFENDANT smacked AW2 in the face and another time when he pushed her out of a car. AW1 believed when she saw AW2 being pushed out the car, AW2 and the DEFENDANT were arguing over money. During an interview, AW1 stated that, "a stack[3] a day keeps daddy[4] away," meaning that THE DEFENDANT had a quota for his girls to make $1000 dollars a day from commercial sex acts for his financial benefit. AW1 believed she worked for the DEFENDANT for approximately 3 years.

AW2 was aware that the DEFENDANT posted advertisements on backpage.com which featured her pictures, as well as pictures depicting AW1. Once the DEFENDANT became comfortable with AW1 and AW2, they were able to post their own advertisements. AW2 was unsure what email account the DEFENDANT and ARMSTEAD utilized to post the sexual solicitation advertisements or if they shared an email, but she knew that the DEFENDANT

---

[3] "Stack" means $1000.

[4] "Daddy" is term used by prostitutes when referring to their pimp.

usually utilized email addresses that had the girls' names in them. Throughout the time AW2 worked for the DEFENDANT, they utilized many different email accounts in order to post sexual solicitation advertisements. However, during the time that AW2 worked for the DEFENDANT, she went by the name of "Diamond Monroe." During an interview, AW2 was asked about the email account lovediamondmonroe@yahoo.com, described above. AW2 stated that she was never in control of that account, nor was she allowed to post advertisements to "backpage.com" when she first arrived to the Washington, DC area.

      During the course of the investigation, law enforcement was able to obtain hundreds of sexually explicit online advertisements that were posted on the website "backpage.com" between April 2015 and August 2015, and which featured AW1 and AW2. These advertisements were posted in the Washington, DC and Northern Virginia sections of the website. There were also advertisements of AW2, particularly in April 2015, that were posted in the Illinois section of "backpage.com." The advertisements contained pictures and contact phone numbers for AW1 and AW2. Some of the advertisements were posted with the account associated with the email address lovediamondmonore@yahoo.com; others were posted with the account associated with lovedaimondmonroe@gmail.com email address; and others were posted with unknown

accounts.[5] An example one of the advertisement is as follows:

> ☕ Your Favorite Morning Treat, It's Never Fun With Just One☕ – 23: Your two favorite girls are here to start your day the right way. 😊 We're a classy never trashy couple that enjoy each other's company and much more. We promise to leave you with a smile and time well spent. ❤ So what are you waiting for? Take your mind on a vacation 🍃 and ask about our specials. 💋 Then come treat yourself to nonetheless, one of kind bunnies. 🐰 📞 Diamond Monroe @ (571)-306-9832 📞 Sophia Sweets @ (443)-985-3862 💯 Independant 💯 Safe 💯 Real.

(http://washingtondc.backpage.com/FemaleEscorts/your-favorite-morning-treat-its-never-fun-with-just-one/18961400). This advertisement was posted on August 23, 2015.

Online sexual solicitation advertisements linked to AW1 and AW2 continued to be posted on various websites, to include "backpage.com," between August 2015 and approximately September 2016. There are over 3000 advertisements posted within this timeframe. Several of these advertisements include multiple other females, some of whom law enforcement have identified and have learned also engaged in commercial sex acts for the DEFENDANT's financial gain. AW1 and AW2 both have a tattoo depicting the playboy bunny symbol, with the word "Playboy" written underneath.[6] These tattoos on AW1 and AW2 can be

---

[5] In April 2018, the FBI seized the website "backpage.com" and now maintains all the records formerly associated with the website. The FBI only has access to what information was on the "backpage.com" servers in April 2018, which is not a full representation of information that was contained on the servers, as some data may have been deleted before the FBI seizure. Law enforcement uses other software that has maintained archive records of the advertisements posted on "backpage.com." The data from this law enforcement database is only what was publicly available in "backpage.com" and does not contain account subscriber information.

[6] Based on my training and experience, your affiant knows that pimps commonly will direct the prostitutes working for them to tattoo the pimp's name or logo on their body as a way to their own names on their women to signify that the prostitutes are the pimp's property.

seen in the pictures posted on their online sexual solicitation advertisements. From May 2016 to December 2016, there are 455 advertisements of AW1 and AW2. These ads also contain a picture of the playboy bunny symbol.

The criminal offenses that the DEFENDANT are charged with are extremely serious, violent offenses that pose a grave danger to the safety of the community. The world of commercial sexual exploitation is extremely dangerous. Studies have shown that women who are engaged in prostitution experience violence ranging from slapping and punching to assaults with deadly weapons and rape. *See* Dalla, R. (2000, November). *Exposing the "pretty woman" myth: A qualitative examination of the lives of female streetwalking prostitutes*. The Journal of Sex Research, 37(4), 344-353 (In a study of prostituted women, 72.1 % reported severe abuse at the hands of pimps, male sexual buyers, or boyfriends. The acts of abuse include being raped, beaten with objects, threatened with weapons, or abandoned in remote locations). An investigation into the mortality rate of women in prostitution revealed that the leading cause of death was homicide, and found that actively prostituting women were nearly 18 times more likely to be murdered than women of similar age and race. *See* Potterat, J., Brewer, D., Muth, S., Rothenberg, R., Woodhouse, D., Muth, J. et al. (2004). *Mortality in a long-term open cohort of prostitute women*. American Journal of Epidemiology, 159(8), 778-785. Furthermore, studies have also demonstrated that a high percentage of individuals who are involved in commercial sex work want to stop prostituting, but feel that they are trapped. *See* Farley, M. and Barkan, H. (1998). *Prostitution, violence against women, and posttraumatic stress disorder*. Women & Health, 27(3), 37-49.

Congress clearly recognized the serious nature of the Defendant's criminal offenses when enacting mandatory minimum penalties of 10- 15 years for these offenses, and allowing for the possibility of a life sentence should the DEFENDANT be convicted. *See* 18 U.S.C. 1591. As

such, this factor weighs heavily in favor of detention.

### B. The Weight of the Evidence Against the Defendant

As summarized above, the evidence against the Defendant is extremely strong. In addition to victim and witness statements, detailed above, the Government is in possession of numerous advertisements - offering MV1 and others up for commercial sexual exploitation – that were posted by an email account controlled by the DEFENDANT. There are hotel records that place the DEFENDANT at the very places that MV1, AW1 and AW2 were engaging in commercial sex for the DEFENDANT's financial gain. Additionally, there are jail calls between the DEFENDANT and ARMSTEAD, and the DEFENDANT and AW1 and AW2, which detail the DEFENDANT's lengthy history of engaging in this criminal conduct. Furthermore, a review of the DEFENDANT's Facebook account, portions of which are publically available, reveals posts and messages that illustrate this DEFENDANT's exploitation of women and his attempts to glorify his criminal lifestyle. For example, the DEFENDANT posted a picture of the playboy bunny symbol, which as detailed above, the DEFENDANT uses as a way to "brand" the women that work for him. He also posted the following message about the need for these women to be loyal to him, writing: "I laugh at these dudes mane, talking bout they bitch bad this bad that but she Unloyal af.[7] But one thing a real nigga know mane is loyalty don't have a color, shape, or size nigga. While you locked, she spending the safe money on dinner for daddy of the night So fuck a "bad bitch", I want one that I can count on, stack wit and chase success with and

---

[7] Af means "as fuck." An expression that can be added to almost any adjective to give emphasis. It generally means, "Extremely" or "To the utmost degree."

ain't gotta worry cause loyalty don't cost shit!!!! ♛[8]." Therefore, the weight of the evidence strongly favors detention, as well.

### C. The History and Characteristics of the Defendant

The DEFENDANT's history and characteristics weigh heavily in favor of detention. He has a conviction for Assault in May of 2007. While that case was pending, the DEFENDANT failed to appear on two separate occasions, and bench warrants were issued. Similarly, he failed to appear several times in connection with his Possession of Marijuana case in 2008.

Perhaps more importantly, this DEFENDANT has a conviction for Pandering in the District of Columbia from July of 2012. Rather than learn from that conviction, the DEFENDANT continued with the same criminal conduct, involving the exploitation of vulnerable minors and young women, that serves as the basis for the charged conduct that has brought him before the Court today. Furthermore, while none of these cases were prosecuted, this DEFENDANT has been arrested at least three times in Prince George's County Maryland for engaging in a Prostitution Business or for Human Trafficking related offenses, in January 2010, July 2013, and May 2017.[9] This is a DEFENDANT who has engaged in this violent, exploitative, criminal conduct for over a decade and he has done so with impunity. When he has been charged with various criminal offenses, and directed to appear in Court, he refuses to do so. In fact, when the DEFENDANT was pulled over pursuant to a traffic stop on August 2, 2020, he had not only the Arrest Warrant that was issued pursuant to these charges, but a warrant out of

---

[8] The crown emoji is known to law enforcement as often being used by pimps. Pimps view themselves as being on top or "king" of their enterprise.

[9] The Defendant failed to appear in Court, as directed, and Failure to Appears were issued in connection with both the 2013 and 2017 arrests.

Baltimore County, as well. All of this information should give this Court grave pause, because this DEFENDANT has spent the majority of his adult life demonstrating that he is extremely unlikely to abide by any conditions this Court would set, should he be released. As such, the Defendant should be detained pending trial.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

The evidence here establishes that the defendant represents a grave danger to MV1 and the other victims and witnesses in this case, as well as to the community at large. As stated above, the DEFENDANT has violently assaulted AW2. When he found out that she would be testifying in ARMSTEAD'S trial, he immediately reached out in an effort to intimidate AW2 and prevent her from testifying. In light of this, the DEFENDANT simply cannot rebut the presumption that exists that there is no condition or set of conditions that can reasonably assure the safety of members of the community.

As stated above, this DEFENDANT has brought women to the area of Washington, D.C. known as the "Track" or the "Blade." This area, from K Street, Northwest to the North at Rhode Island Avenue, Northwest, and from the East at 9th Street, Northwest, to the West at 14th Street Northwest, which the DEFENDANT has frequented over the years in order to engage in the commercial sexual exploitation of multiple young women, has become extremely problematic for law enforcement. As a result of the criminal actions of the DEFENDANT, and others like him who engage in the commercial sexual exploitation of women, residents living in the target area have become witnesses to, and victims of, crime. This has led to a large number of complaints to police, typically made in the early morning hours. The ongoing prostitution in the area has been linked to reports by members of the community of robberies and violent assaults. When this is viewed in combination with the DEFENDANT's lengthy arrest and criminal history, which

includes arrests and convictions for assault, the DEFENDANT's release would pose a serious risk to not only to MV1 and AW2, but also to members of the community. As such, he should be detained pending trial.

## CONCLUSION

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the DEFENDANT should be detained pending trial.

        Respectfully submitted,

        MICHAEL SHERWIN
        UNITED STATES ATTORNEY
        N.Y. Bar No. 4444188


By:  s/ Amy E. Larson
      AMY E. LARSON
      Assistant United States Attorney
      N.Y. Bar No. 4108221
      U.S. Attorney's Office
      555 4th Street, N.W.
      Washington, D.C. 20530
      202-252-7863
      Amy.Larson2@usdoj.gov